ARCHER & GREINER, P.C.
Court Plaza South - West Wing
21 Main Street, Suite 343
Hackensack, New Jersey 07601
(201) 342-6000
Attorneys for Plaintiff

BY:  Patrick Papalia, Esquire
      Robert T. Egan, Esquire
      Laura Link, Esquire

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| US TECH SOLUTIONS, INC. and WORKSPEND, INC., <br><br>      Plaintiffs <br><br> v. <br><br> eTEAM, INC., JAMES LUCIER, and JENNIFER HEWITT <br><br><br>      Defendants. | JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiffs US Tech Solutions, Inc. ("USTECH") and Workspend, Inc. ("Workspend") (collectively, "Plaintiffs"), by their undersigned counsel, hereby alleges against Defendants eTeam, Inc. ("eTeam"), James Lucier ("Lucier"), and Jennifer Hewitt ("Hewitt") (collectively, "Defendants") as follows:

### <u>NATURE OF THE ACTION</u>

1.     Plaintiffs bring this action against eTeam, Lucier, and Hewitt for temporary restraints, preliminary and permanent injunctive relief and damages for breach of the duty of

loyalty, breach of contract, violation of the New Jersey Computer Related Offenses Act, misappropriation of trade secrets under the federal Defend Trade Secrets Act, misappropriation of confidential information and trade secrets, conversion, violation of the New Jersey Trade Secrets Act, misappropriation of trade secrets under the federal Defend Trade Secrets Act, tortious interference with contract, tortious interference with prospective economic advantage, unfair competition, and civil conspiracy, all caused by, among other things, Lucier's (i) theft of Plaintiffs' highly sensitive, confidential, and proprietary business information such as that pertaining to Plaintiffs' short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to Plaintiffs' by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual relationships with their suppliers, the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff, and more; (ii) his and Hewitt's improper disclosure and use of Plaintiffs' confidential information and trade secrets to and on behalf of eTeam; and (iii) his conspiracy with eTeam and Hewitt to unlawfully use Plaintiff's confidential information and to unlawfully divert Plaintiffs' business.

## **PARTIES**

2.      Plaintiff USTECH is a corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business located at 10 Exchange Place, Suite # 1820, Jersey City, New Jersey, 07302.

3.      Plaintiff Workspend is a corporation duly organized and existing under the laws of the State of Nevada, with its principal place of business located at 10 Exchange Place, Suite # 1820, Jersey City, New Jersey, 07302.

4.      Defendant Lucier is an adult individual who is a citizen of the State of Florida residing at 9308 Merlot Circle, Seffner, Florida 33584.  Lucier is a former employee of Plaintiffs.

5.      Defendant Hewitt is an adult individual who is a citizen of the State of North Carolina residing at 206 Cape Cod Drive, Cary, North Carolina, 27511.  Hewitt is a former employee of Plaintiffs.

6.      Defendant eTeam is a corporation duly organized and existing under the laws of the State of New Jersey with its principal place of business located at 1001 Durham Avenue, Suite 201, South Plainfield, New Jersey, 07080.

## JURISDICTION AND VENUE

7.      The Court has personal jurisdiction over Lucier in this action because Lucier has consented to same.  Specifically, as discussed in more detail below, Lucier executed an employment agreement ("Lucier Employment Agreement") when hired by Plaintiffs which contains the following language:

> This Agreement is governed by and is to be construed and enforced in accordance with the laws of New Jersey as though made and to be fully performed in New Jersey (without regard to the conflicts of law rules of New Jersey).  All disputes arising under this Agreement are to be resolved in the courts of the State of New Jersey.  If any party desires to commence an action to enforce any provision of this Agreement, such action must be instituted in the appropriate New Jersey court.  The parties consent to the jurisdiction of the New Jersey courts.  The parties agree that the courts of the State of New Jersey are to have exclusive jurisdiction over this Agreement.  The parties agree that service of any process is effective if served in the manner that a Notice may be served pursuant to this Agreement.

The current dispute relates to and arises from the terms of the Lucier Employment Agreement.

8.     The Court also has personal jurisdiction over Lucier in this action because Lucier has conducted business and conducts business in or affecting this the State of New Jersey, has worked for entities whose principal places of business are in New Jersey since at least 2009 and continues to do so and has caused damage to Plaintiffs within the State of New Jersey.

9.     The Court has personal jurisdiction over Hewitt in this action for the same reasons it has personal jurisdiction over Lucier.  Namely, as discussed in more detail below, Hewitt executed an employment agreement ("Hewitt Employment Agreement") when hired by Plaintiffs which contains the following language:

> This Agreement is governed by and is to be construed and enforced in accordance with the laws of New Jersey as though made and to be fully performed in New Jersey (without regard to the conflicts of law rules of New Jersey).  All disputes arising under this Agreement are to be resolved in the courts of the State of New Jersey.  If any party desires to commence an action to enforce any provision of this Agreement, such action must be instituted in the appropriate New Jersey court.  The parties consent to the jurisdiction of the New Jersey courts.  The parties agree that the courts of the State of New Jersey are to have exclusive jurisdiction over this Agreement.  The parties agree that service of any process is effective if served in the manner that a Notice may be served pursuant to this Agreement.

The current dispute relates to and arises from the terms of the Hewitt Employment Agreement.

10.     Additionally, the Court has personal jurisdiction over Hewitt in this action because she has conducted business and conducts business in or affecting this the State of New Jersey, has worked for entities whose principal places of business are in New Jersey since at least 2014 and continues to do so and has caused damage to Plaintiffs within the State of New Jersey.

11.     The Court has personal jurisdiction over eTeam in this action because eTeam's principal place of business and corporate headquarters are located in New Jersey and eTeam conducts business in New Jersey.

4

12.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under the Defend Trade Secrets Act of 2016.  Pursuant to 28 U.S.C. § 1367, Plaintiffs' remaining claims fall within this Court's supplemental jurisdiction because they are so related to the federal claims that they form part of the same case or controversy.

13.     Pursuant to 28. U.S.C. § 1391, venue is appropriate because a substantial part of the events giving rise to Plaintiffs' claims, and the damages sustained in this dispute, occurred within this district and a substantial part of Plaintiff's property that is the subject of the action is situated in this district.

## FACTS

### USTECH Background

14.     USTECH is a global temporary staffing and technology consulting firm that primarily provides recruitment and placement services, as well as other incidental services, to a wide range of clients.  Companies in several industries – e.g. healthcare, manufacturing and technology – employ large amounts of temporary labor to accomplish a variety of tasks. USTECH is in the business of supplying those employees.  To do so, it solicits job orders from employers in need of temporary staffing and then recruits, interviews and assigns temporary employees who have the credentials the employers seek.

15.     Manoj Agarwal ("Agarwal") is the CEO / President of USTECH and Workspend and has been so at all times relevant to this matter.

### USTECH Hires Lucier to Serve A Critical Function in the Company

16.     On January 12, 2009, USTECH hired Lucier to serve as its Senior Business Development Executive / Account Manager.

17.     Upon hire, Lucier executed the Lucier Employment Agreement, referenced above, which governed the terms and conditions of his employment.  The fully executed copy of the Employment Agreement was destroyed on or about April 28, 2011 when the building within which USTECH operated at the time collapsed.  While the actual copy of the fully executed Employment Agreement was not retrieved following the collapse, a true and accurate copy of the form of Employment Agreement that Lucier executed is attached hereto as Exhibit A.

18.     Given that Lucier's position would entail both access to confidential information and trade secrets as well substantial contact with the company's current and prospective clients, the Employment Agreement contained several provisions designed to safeguard USTECH's interests in its confidential information and trade secrets, its client relationships, and its investment in Lucier.

19.     Specifically, the Employment Agreement required Lucier to "devote [his] entire energy and full undivided attention exclusively to the business of the Company."  It also specifically confirmed that "[a]ll the clients, leads and recruits generated by [Lucier] during the term of Employment will be a property of the Company" and that "[o]nly the Company will have a right over the same in case of termination of Employment relationship."

20.     To protect the company's confidential information and trade secrets, the Employment Agreement restricted Lucier's use and disclosure of such information.  Specifically, Article 5, Section 5.4 of the Agreement provides:

> [Lucier] agrees to keep all Proprietary Information confidential. [Lucier] agrees to refrain from communicating or divulging any of the Proprietary Information to any person, firm or corporation during the term of employment and for a period of Two (2) years following the termination of this Agreement for any reason whatsoever.

21.     Article 5, Section 5.5 specifically noted that the restrictions on Lucier's use and disclosure of the company's confidential information extended to information acquired about the company's clients.  That section provides:

> The Company has acquired, and during the Term [Lucier] will acquire much similar information about the business of the Company's customers.  That Contractor agrees to treat the information acquired about the Company's customers in the same manner and under the same restrictions of this Article 6.

22.     To safeguard Plaintiffs' interests and investments, the Employment Agreement also included non-solicitation provisions.  Specifically, Article 6 of the Employment Agreement provides in relevant part:

> The Contractor covenants and agrees that for a period of One (1) year following the termination of his employment for any reason whatsoever, the Contractor shall not directly or indirectly do any of the following:
>
> 6.1  Solicit or accept any business from a person, firm or corporation that is a direct or indirect customer of the Company during the time the Contractor is employed by the Company; and
>
> 6.2  Solicit or accept any business from any person, firm or corporation that is a prospective customer of the Company with whom the Contractor had any dealings on the Company's behalf during the term of employment.
>
> …
>
> 6.4  All the clients, leads and sales material generated by the Contractor during the term of employment with the Company will be a property of the company.  The Contractor will have no right whatsoever over the same.

23.     In Article 7 of the Employment Agreement, Lucier agreed that the restrictions imposed by the Employment Agreement, detailed above (1) are reasonable and necessary to protect the legitimate business interests of the company; and (2) would not impose an undue hardship on him.  He also agreed that in the event he breached the restrictions in the Employment

Agreement, the company had the right recover both injunctive relief and monetary damages as well as court costs and reasonable attorneys fees.

24.     From 2009 to 2012, Lucier served a critical role in the management of USTECH. Specifically, he worked closely with Agarwal in managing all of USTECH's business operations, marketing and sales efforts and cultivating customer relationships.

25.     As expected and by virtue of his critical role in the company, Lucier became intimately familiar with USTECH's business operations and confidential information and trade secrets.  This information included, but was not limited to, USTECH's short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to USTECH by prospective and current customers, including the types of talent that they need, the frequency of their needs, and information on their costs and expenses associated with their temporary staffing needs.

**Lucier Helps Create Workspend and Assumes Role as Executive Vice President**

26.     The process of comprehensively managing a client company's temporary employees requires tasks beyond matching temporary employees and employers.  In or about 2012, Agarwal and Lucier began to work together to develop a plan to expand USTECH's business model by creating a separate entity that would function as a Managed Service Provider ("MSP") by providing comprehensive consulting and managerial services and related technologies to manage the temporary staffs of client companies.   A separate entity was created in 2012 under the name of Workspend, Inc. ("Workspend") to accomplish these purposes and develop the MSP business.

8

27.     Lucier was assigned to serve as the Executive Vice President of Workspend upon its creation and did so until his resignation on October 12, 2016.

28.     Workspend provides temporary staffing management services, which includes management of end to end "procure-to-pay process" services which provide clients with technology tools and a management services team that enable them to manage every aspect of their relationships with temporary staff members and their temporary staff suppliers in a streamlined fashion.  The technology provides clients with a user-friendly interface in which they can, among other things, put in a request to a supplier for temporary staffing, oversee the recruitment of temporary staffing, create and manage assignments for temporary staff, conduct background checks on temporary staff, manage and regulate the timekeeping, scheduling, and expenses of temporary staff, monitor the performance of temporary staff, and provide reports to manage the expense of their temporary staffing programs, automate the invoicing process between the client and their suppliers of temporary staff and track quality metrics such as program performance, supplier performance (i.e. whether roles are being filed within stipulated timelines and at stipulated rates), and savings.

29.     Lucier served a critical role in Workspend's development and launch as a startup company, working with Workspend's sales, operational, technical and managerial staffs to develop its product and cultivate customer relationships to make a market for its services.

30.     Lucier was highly compensated for the work he performed on behalf of Workspend.  Specifically, Lucier was paid a salary of **$129,951.64** in 2012, **$189,672.16** in 2013, **$202,269.36** in 2014, **$253, 230.80** in 2015, and **$220,461.56** for the portion of 2016 for which he was employed with the company.

31.     In connection with his assignment, Lucier became intimately familiar with Workspend's business operations and confidential information.  This information included, but was not limited to, Workspend's short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to Workspend by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual relationships with their suppliers, the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff, and more.

## USTECH Hires Hewitt as Regional Vice President

32.     On November 3, 2014, Plaintiffs hired Jennifer Hewitt ("Hewitt") to serve as the Regional Vice President in the area of Raleigh, North Carolina.

33.     Hewitt's job duties included managing current client relationships and engaging in sales efforts on behalf of both USTECH and Workspend.  Her sales efforts included developing new leads from scratch and actively soliciting business from prospective leads that had been developed by Plaintiff's other sales employees and supplied to Hewitt by Plaintiffs.

34.     Upon hire, Hewitt executed the Hewitt Employment Agreement, referenced above, which governed the terms and conditions of her employment.  A true and accurate copy of the Hewitt Employment Agreement is attached hereto as Exhibit B.

35.     Per the terms of the Hewitt Employment Agreement, Hewitt agreed that she would not "disclose any Corporate Information to any person or use any Corporate Information for [her] own benefit or for the benefit of any other person, except in furtherance of the Company's business, or in any way that would be detrimental to any of the Company's business."  As to the definition of "Corporate Information," the agreement instructs as follows:

> Any knowledge, information or documents of any of the company including, but not limited to, client lists, employee information, employee lists, prospective client lists, client contract, processes, consulting and training methodologies, operational methods and procedures, business and marketing plans, product development ideas, designs of projects, research projects, products, systems, software, models, modules, templates, source code and object code, designs, business systems, consulting models, creative and graphical work, venture and business plans, programs and financial plans, or improvements modifications, components, prototypes or works thereof, pertaining to the Company business, ventures or its clients shall constitute "Corporate Information", whether or not reduced to tangible form, held electronically or marked in physical writing or electronically as "confidential" and any information which has or may be derived or obtained from such information.

36.     Hewitt was highly compensated for the work she performed for Plaintiffs. Specifically, she earned a yearly salary of **$100,000** and also was eligible to earn commission payments in accordance with Plaintiffs' Sales and Account Management Incentive Plan.

37.     By virtue of her position, Hewitt became intimately familiar with Plaintiffs' customers and Plaintiffs' confidential information relating to the current and prospective customers she was managing and/or soliciting on Plaintiffs' behalf.  Specifically, Hewitt was privy to Plaintiffs' business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, computer software, and  information provided to Plaintiffs by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff

members are assigned, the identities of their temporary staff suppliers, the terms of their

contractual relationships with their suppliers, the expenses and costs associated with their

temporary staffing programs including the rates at which they compensate their temporary staff,

and more.

**USTECH and Workspend Substantially Invest in Developing Customer Relationships, Developing Confidential information and Trade Secrets, and Providing Specialized Training**

38.     USTECH and Workspend have devoted a significant amount of time, labor and

financial resources – upwards of hundreds of thousands of dollars – to develop their confidential

information and trade secrets and customer relationships as well as to provide specialized

training to their employees, including Lucier and Hewitt.

39.     USTECH and Workspend have undertaken reasonable efforts to maintain the

secrecy of their confidential information and to protect their customer relationships by, among

things, prohibiting all employees from wrongfully using and/or disclosing the companies'

confidential information; by requiring employees with access to such information to sign

agreements containing non-disclosure provisions, such as those contained in the Lucier and

Hewitt Employment Agreements, acknowledging the confidentiality of the companies'

information and agreeing not to improperly use and/or disclose such information; maintaining

confidential information on networks which are accessed via password; and restricting access to

confidential information on a need to know basis.

40.     Access to confidential information is restricted both by Plaintiffs' reporting

structure and by personnel assignment.  Information pertaining to a particular customer is

accessible only to those sales employees who are actually working on soliciting the business of

that particular customer.  Because Lucier served as the Executive Vice President and the lead

field sales employee, he – unlike the rest of USTECH and Workspend's employees – had access

to <u>all</u> of the sales data in USTECH and Workspend's system.  The sales representatives who worked under Lucier had access only to information directly related to their assignments.

41.     The companies' employ approximately thirteen (13) individuals who serve as an inside sales team, plus a field sales team of approximately seven (7) to eight (8) individuals.  The inside sales team works to first identify a universe of prospective clients, and then to pare that universe down through research efforts to a more targeted list that contains only prospective clients who are most likely to be converted into real business.  The field sales representatives are responsible for identifying new opportunities in the market in which  they operate and also collaborate with the insides sales team to close opportunities.

42.     The inside sales team also works to identify and ascertain contact information for the decision-makers of the prospective clients as well as all other relevant information they can obtain with regard to the business of the prospective clients in order to maximize the likelihood of success of business pitches made to those companies.

43.     The inside sales team compiles the information gathered into databases and spreadsheets which set forth the leads they have identified and contact information for same. They then pass these "warm leads" to field sales employees who use the information gathered to present focused proposals that have a higher likelihood of success.

44.     Lucier served as the lead field sales employee and was privy to all of the information gathered regarding these "warm leads" throughout the course of his employment. Lucier worked on leads generated or refined by Workspend personnel, and he established communications and relationships with key personnel at Workspend's potential clients.

45.     In addition to the efforts described above, USTECH and Workspend's business development efforts included substantial investments – again upwards of hundreds of thousands

of dollars – in attending and presenting at industry trade shows and conferences.  By way of example:

      (a)     USTECH and Workspend spent a total of **$320,000** to participate in the Staffing Industry Analysts Contingent Workforce Summit ("SIA CWS") in 2013, 2014, 2015 and 2016.  Staffing Industry Analysts are the leading authority on temporary staffing matters in the United States and, thus, the SIA CWS is the premier conference for MSPs in this industry.  Approximately 200 to 250 client companies with around 400 to 500 attendees in need of MSP services attend the yearly conference, which spans two full days.  For solution providers such as USTECH and Workspend, the conference presents an invaluable opportunity to meet and network with prospective clients and to present product demonstrations.  In advance of each of these conferences, USTECH and Workspend's sales team worked to pre-schedule between 60 to 70 meetings with prospective clients attending the conference which enabled the companies to build a strong pipeline of clients.  As a result of USTECH and Workspend's participation and efforts in this regard over the last five years, the companies have generated at least 200 to 250 prospective clients with whom they have had some level of engagement.  Lucier was integral to all of these efforts – he attended the conferences, attended the pre-scheduled meetings with the prospective clients identified by the inside sales team, and was privy to all of the research efforts and confidential data acquired regarding the prospective clients.

      (b)     USTECH and Workspend spent a total of **$85,000** to participate in the Chief Procurement Officer Summit ("CPO Summit") in 2014, 2015 and 2016.  This annual event is organized by Marcus Evans, a marketing and event management company.  It attracts CPOs of mid-size firms with revenues in the range of $1 billion to $5 billion and spans two full days of events.  Solution providers who sponsor the event have the opportunity to pre-schedule one-on-

one meetings with 15 to 20 prospective clients who have been identified as sharing mutual interests and needs.  In each of the years USTECH and Workspend participated in this event, the companies were able to generate between 10 to 15 warm leads.  Again, Lucier was integral to all of these efforts – he attended the conferences, attended the one-on-one meetings, and was privy to all information gathered about the prospective clients.

(c)     USTECH and Workspend spent **$20,000** to participate in the Procurecon Contingent Workforce Summit in 2016.  This event was organized by WBResearch, a marketing and event management company specializing in procurement events.  It attracted between 80 to 100 prospective clients and spanned two full days of events.  USTECH and Workspend staffed an exhibit booth at the event and met with several prospective clients.  Lucier attended this event, met with prospective clients, and was privy to all information gathered regarding those prospective clients.

46.     USTECH and Workspend also invested directly in Lucier and Hewitt by providing them both with specialized training pertaining to MSP services at the cost of **$6,000** ($3,000 for each).  Specifically, the companies paid for Lucier and Hewitt to attend a two-day training program sponsored by Staffing Industry Analysts known as SIA CCWP.  This program focused on how to build and manage temporary staffing programs and prepared trainees with a jumpstart that would assist them in managing such a program right away.  Trainees who successfully completed the training – including Lucier and Hewitt – were awarded a certification.

**Workspend Spends 18 Months Striking a Deal With BMC**

47.     In or about February 2015, Hewitt identified BMC as a prospective client that may be in need of temporary placement services.  To that end, Hewitt began discussions with

BMC in an effort to get the company to retain the services of USTECH to recruit and assign temporary staff to the company.

48.     During her discussions with BMC, Hewitt learned that BMC was unhappy with its current provider of MSP services for temporary staff – a company named Pontoon.  Thus, Hewitt began talking to BMC about potentially severing its ties with Pontoon and establishing a contractual relationship with Workspend.

49.     Over the course of the next four months or so, Hewitt continued to engage BMC in discussions on behalf of Workspend for the purpose of obtaining the company's business. Hewitt initially invested more than 100 hours prospecting BMC and specifically collaborated with BMC to demonstrate the technology that Workspend could furnish to them to provide the services they needed.

50.     Throughout her discussions with BMC, Hewitt updated Lucier on the nature of her discussions with the company and the progress of the deal.  She then worked directly with Lucier to create and propose a customized solution to BMC.  In order to do so, Hewitt and Lucier did an assessment of the program that was being furnished to BMC by Pontoon and put together a proposal which set forth ways in which Workspend could improve upon that program.  Lucier spent over 160 hours working on this assessment and proposal with Hewitt.

51.     In order to prepare the assessment and a proposed solution for BMC, BMC furnished to Hewitt and Lucier information about the terms of their agreement with Pontoon, the identities of their suppliers of temporary staff, the performance of their suppliers and temporary staff members, the types of work provided by and the assignments specifically given to their temporary staff, the expenses and costs associated with their temporary staffing program, their

specific talent needs and the frequency of their needs, and more.  Hewitt and Lucier were the only Workspend sales employees who had authorized access to this information.

52.    On June 3, 2015, BMC's HR Director, Elaine Gallagher, informed Hewitt and Lucier via email that BMC was planning to merge with Stock Building Supply to create BMC Stock Holdings, Inc. ("BMC").  This merger would result in the combining of the two workforces and thus, expanded the scope of the services that Workspend would provide.

53.    Given the expanded scope of the project, Workspend decided to invest additional resources to craft a sophisticated solution for BMC in order to maximize the chances that it would obtain the BMC contract.  To that end, Workspend assigned a team of software engineers the task of creating new proprietary software – unique to Workspend and customized to address the specific needs of BMC – that would be used to assist BMC in the management of its temporary workforce.

54.    On November 11, 2015, Hewitt resigned her employment.  On November 19, 2015, Hewitt was reminded via email by Plaintiffs of her post-employment contractual obligations as set forth in the Hewitt Employment Agreement.  An additional copy of the Hewitt Employment Agreement was attached for Hewitt's reference.

55.    Following Hewitt's resignation, Lucier took over as the lead sales employee on the BMC deal.  In that capacity, Lucier travelled to BMC's location in Raleigh on several occasions to gather more information from BMC for the purpose of continuing to craft a customized solution.  Lucier ultimately invested an additional 100 hours working with BMC personnel to develop the relationship further.

56.    The solution proposed to BMC involved the provision of Total Talent Management Services ("TTMS").  The proposed TTMS included the provision of recruitment

17

and placement services of full-time staff for BMC using Workspend's Recruitment Process Outsourcing ("RPO") model and temporary staff management services (MSP services) using the technology platform referenced above known as a Vendor Management System ("VMS"). Thus, Workspend was slated to provide BMC with a complete talent management solution for all of BMC's talent needs.

57.    In early 2016, BMC accepted the solution as generally proposed to them by Lucier. Lucier then went to work creating an MSP agreement, VMS agreement, RPO agreement, and an implementation plan. He spent between approximately 500 and 600 hours working on these tasks.

58.    In or about April or May of 2016, Lucier sent BMC proposed contract documents. During the next three months or so, several revised versions of the contract documents were exchanged between the parties.

59.    On July 23, 2016, Lucier sent Agarwal an email providing him with a status update on his progress in soliciting business from several of Workspend's prospective clients. With regard to BMC, Lucier stated, "BMC contract should be back to us on Monday. RPO live on 8/25 and MSP live on 11/1."

60.    In August 2016, the parties reached an agreement on all of the business terms of the deal and BMC informed Workspend of its intent to execute the contract agreements pending final approval from their legal department.

61.    Per the terms of the contract documents, the deal with BMC would have resulted in $20 to $25 million in annual revenue for Workspend for a minimum three (3) year contract with the strong possibility of additional renewals – a deal which would help put Workspend on the MSP map.

62.     On September 9, 2016, Lucier sent Agarwal an email advising of a holdup with the BMC contract, but noting that Elaine Gallagher of BMC "said it is not a cause for concern," that the "the contract should be back by the end of next week" and that Elaine "wants to stay with a Nov 1 go-live."

**Lucier Abruptly Resigns and Deletes Workspend's Information from Company Laptop**

63.     On a date presently unknown to Plaintiffs, and unbeknownst to Plaintiffs at the time, Lucier began to collaborate with eTeam and Hewitt to misappropriate Plaintiffs' trade secrets and confidential information and to misappropriate Workspend's business and prospective business, including its pending agreement with BMC – a scheme that ultimately proved successful.

64.     On May 19, 2016, Lucier sent an email from his USTECH email account to the email address jamesdlucier@yahoo.com, an address that was not and is not associated with Plaintiffs.   Several electronic files containing Workspend's confidential information and trade secrets were attached to that email, including several relating to BMC.

65.     On September 18, 2017, Lucier sent an email from his USTECH email account to the email address jamesdlucier@yahoo.com.  Several files containing Workspend's confidential information and trade secrets were attached to that email, including lists of clients and prospective clients with specific information that was generated about them by USTECH and Workspend's sales team.

66.     On October 12, 2016, Lucier abruptly resigned his position.  Lucier provided no information regarding his future employment plans.  As of that date, Workspend had no indication that its deal with BMC was in any sort of jeopardy.

67.     At the time of his resignation, Lucier was engaged in the active solicitation of more than fifty (50) prospective clients on behalf of Workspend.

68.     Plaintiffs had furnished Lucier with a Dell laptop for business use.  There were several thousands of computer files, including emails, stored on the laptop while it was in Lucier's use, many of which contained the Plaintiffs' confidential information and trade secrets including but not limited to information pertaining to the fifty (50) prospective clients that Lucier was soliciting on behalf of Workspend.  Additionally, many of these files were created and/or stored on the laptop alone, and thus, were the Plaintiffs' only copy of such files.

69.     By October 14, 2017, Lucier had caused certain computer files that contained Workspend's confidential information and trade secrets to be copied or transferred to and stored in the cloud and on various external computer drives, such as thumb drives or USB drives.

70.     On various dates in September and October 2017, Lucier plugged several devices into a laptop that Plaintiffs had furnished him for business use, and accessed several computer files that had been stored in the cloud or on external drives and that contained Workspend's confidential information and trade secrets.  Nine of those devices were inserted into the laptop's USB port on October 7, 13 and 14, 2017 alone.

71.     On several dates, including October 11 and 12, 2016, Lucier accessed computer files that contained Workspend's confidential information and trade secrets and which, at the time, were stored on the laptop itself.

72.     On October 13, 2016 at 2:17:28 PM – the day after Lucier's resignation – Lucier performed an Internet search for the term "permanently delete."  Two minutes later, Lucier installed a program on the laptop called "CCleaner," which has the ability to delete and permanently erase data that is stored on a hard drive.  He used CCleaner to delete from the laptop many of the computer files that contained Workspend's confidential information and trade secrets.

73. On October 18, 2016, Plaintiffs received a shipment from Lucier which contained the company Dell laptop computer that had been given to him to perform his work duties.

74. Upon inspecting the laptop, Plaintiffs' discovered that Lucier had deleted Plaintiffs' data and documents  from the laptop.

75. Given this discovery, on October 21, 2016, counsel for USTECH and Workspend sent Lucier a letter regarding his unlawful theft and destruction of the data on Plaintiffs' laptop and demanded an immediate response to the letter.

76. Lucier did not respond to the October 21, 2016 letter.

**Lucier and Hewitt Join eTeam and Conspire with eTeam to Steal the BMC Deal**

77. Shortly after Lucier's resignation, Plaintiffs learned that Lucier updated his LinkedIn profile to reflect that he had accepted a new position with eTeam, Inc. ("eTeam").

78. eTeam had never engaged in the business of providing temporary staffing MSP services and had not provided such services to a single client prior to hiring Lucier.

79. Nonetheless, almost immediately after hiring Lucier, eTeam entered into a contractual agreement with BMC pursuant to which eTeam is providing the same exact type of services to BMC that Workspend would have provided to BMC had Lucier and eTeam not usurped the opportunity from Workspend.

80. Plaintiffs learned this information when Pontoon sent USTECH an email, dated December 30, 2016, notifying USTECH that Pontoon would no longer be providing MSP services to BMC effective January 29, 2017.  This notification was provided to USTECH because USTECH was serving as a temporary staffing supplier for BMC at the time per a Supplier Agreement it had entered into with Pontoon.

81.     Then, on January 16, 2017, eTeam copied USTECH employees on an email that appears to have been intended for BMC's temporary staff suppliers.  It was apparent from the contents of the email that eTeam had assumed the role of serving as BMC's MSP provider and was specifically providing RPO, MSP, and VMS services to BMC – the same services that Workspend was slated to provided to BMC.

82.     By email dated January 30, 2017, Pontoon's Program Consultant, Callie Alloway, reminded Plaintiffs that Pontoon was no longer the MSP provider for BMC and confirmed that eTeam had taken over the BMC account.  Alloway also noted that she was including on the email members from eTeam who had taken over the BMC account.  Both Lucier and Hewitt were among the members.  Thus, Plaintiffs learned that eTeam had also hired Hewitt and had assigned her, along with Lucier, to the BMC account.

83.     It is widely known throughout the temporary staffing management industry that it takes approximately six to twelve months, and often longer, to create and finalize an agreement akin to that entered into between eTeam and BMC.  Given the expansive scope of the BMC deal, and as detailed above, Workspend invested more than 18 months in developing its solution for BMC.

84.     The short time lapse between Lucier's hire by eTeam and the entry of its agreement with BMC reveals that Defendants must have used USTECH and Workspend's confidential information – including but not limited to the information Hewitt and Lucier gathered from BMC on behalf of Workspend and at Workspend's expense – in order to steal BMC's business from Workspend.  This conclusion is further compelled by the fact that eTeam had no experience in the MSP business prior to hiring Lucier and that it hired Hewitt at about the same time as Lucier and assigned them both to the BMC account.

**Lucier and eTeam Continue Unlawful Conduct Despite Cease and Desist Requests**

85.    Given the discovery that Lucier not only stole and destroyed Plaintiffs'
confidential information, but had also used it to steal Workspend's' business, counsel for
Plaintiffs sent another letter to Lucier, dated January 18, 2017.

86.    The January 18, 2017 letter to Lucier addressed his unlawful theft and deletion of
company data as well as his newly discovered improper solicitation of BMC on behalf of eTeam.
The letter demanded that Lucier (a) cease and desist from any business dealings with BMC; (b)
rescind any and all agreements between BMC and eTeam; (c) refrain from taking any further
actions in using Workspend's business data; and (d) return all data that was converted from
Workspend.

87.    On January 18, 2017, Plaintiffs' counsel also sent eTeam's CEO, Ben Thakur
("Thakur"), a letter.  The letter addressed eTeam's facilitation of Lucier's theft of Workspend's
confidential data and its participation in the unlawful diversion of Workspend's business,
including the business of BMC.  It demanded that eTeam (1) cease and desist from any business
dealing with BMC; (2) rescind any and all agreements between BMC and eTeam; (3) refrain
from taking any further actions that use Workspend data or interfere with Workspend's business;
and (4) return all of Workspend's business data.

88.    Following the delivery of the January 18, 2017 letter addressed to eTeam,
eTeam's counsel, Robert J. Basil, Esq. ("Mr. Basil"), Thakur, and Plaintiff's counsel, Patrick
Papalia, Esq. ("Mr. Papalia"), engaged in discussions and correspondence regarding the matters
at issue.

89.    During those discussions, Mr. Basil indicated to Mr. Papalia that Lucier had his
own counsel and that Mr. Basil did not represent Lucier's interests.  Also during those

discussions, Mr. Papalia raised several questions regarding Lucier's deletion and retention of Plaintiffs' data as well as the amount of time required to implement and obtain a deal akin to the BMC deal acquired by eTeam.  Mr. Basil responded that he would reach out to Lucier to discuss these matters and would get back to Mr. Papalia.

90.    In an email dated February 2, 2017, Mr. Basil reported the following to Mr. Papalia:

> I have been in contact with Mr. Lucier.  Here is his version of the laptop issues:
>
> Before JL left the company, he asked the he asked the company IP officer to help him remove his personal files from the laptop.  The company IT officer told JL that he should just buy an external hard drive and do it himself.
>
> JL's wife purchased an external hard drive from Sam's Club.  JL then plugged it into the laptop and the software that came with the hard drive popped up.  JL then attempted to download his personal items on to the hard drive.  JL was unable to operate the software, and gave up.  His review of the hard drive at the end of the process showed no files or folders.  He did not intentionally "wipe" anything from the hard drive, although he does not know if the software had any effect on the laptop.
>
> He returned the hard drive to Sam's Club and received a refund.  He made no effort to take anything off of the hard drive and made no further efforts to take anything off of the laptop before returning it to the Company.

91.    In response to this email, Mr. Papalia requested the Lucier provide an affidavit confirming the veracity of the account memorialized above.  In response to that request, Mr. Basil advised that he would speak to Lucier about the request and get back to Mr. Papalia.  Mr. Papalia followed up with Mr. Basil on this request multiple times.  Mr. Basil did not respond until February 14, 2017 when he stated via email that (1) he would be representing Lucier from that point forward, and (2) Lucier would not be providing an affidavit.

92.     Lucier's account of the deletion of files from the laptop is blatantly and deliberately false.  In fact, Lucier undertook an effort to delete files from the laptop in a deliberate attempt to deprive Plaintiffs of the information that was stored on it and which Lucier had copied or transferred to other media, for his use, as well as to cover his tracks and render the laptop useless as a repository of information which would reveal the details of his schemes.

93.     Despite Lucier and eTeam's receipt of the October 21 and January 18 letters, and communications among counsel, Lucier and eTeam – along with Hewitt – have continued to engage in business dealings with BMC, continued to use Workspend's data for the purpose of interfering with Workspend's business and failed to return Workspend's confidential information including all of the data that was converted from the company laptop used by Lucier.

94.     Beginning on a date presently unknown to Plaintiffs, but no later than September 9, 2016, Lucier has been an agent, servant and/or employee of eTeam and acted as an authorized agent of, and in the interests of and/or at the direction of eTeam, as a result of which eTeam is vicariously liable for Lucier's acts as described in this Complaint.

95.     Beginning on a date presently unknown to Plaintiffs, but no later than the date she became employed by eTeam,  Hewitt has been an agent, servant and/or employee of eTeam and acted as an authorized agent of, and in the interests of and/or at the direction of eTeam, as a result of which eTeam is vicariously liable for Hewitt's acts as described in this Complaint.

## COUNT I – BREACH OF DUTY OF LOYALTY
### (against Lucier)

96.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

97.     Lucier was an employee of Plaintiffs.  By virtue of his position as an employee of Plaintiffs, and especially based on his position as Executive Vice President, he owed Plaintiffs a duty of the highest loyalty, good faith, integrity and fair dealing.

98.     Under the common law, Lucier owed a duty to Plaintiffs not to disclose, use or misappropriate Plaintiffs' confidential information and trade secrets.

99.     Lucier misappropriated, used and/or will necessarily use or disclose in the future confidential information and trade secrets belonging to Plaintiffs, in breach of his common law duty of loyalty to Plaintiffs.

100.    Lucier used confidential information and trade secrets belonging to Plaintiffs for his own personal benefit and/or the benefit of eTeam.

101.    Use or disclosure by Lucier of the above-stated confidential and proprietary information of Plaintiffs has caused and will cause Plaintiffs to suffer harm.

102.    Unless Lucier is restrained and enjoined from breaching his common law duty not to disclose, use and/or misappropriate confidential information and trade secrets of Plaintiffs, Plaintiffs will suffer and continue to suffer immediate and irreparable injury and harm for which there is no adequate remedy at law.

103.    Lucier's conduct has been willful, wanton and with the intent to damage the business of Plaintiffs.

## COUNT II - BREACH OF CONTRACT
### (against Lucier and Hewitt)

104.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

105.    The Lucier Employment Agreement and the Hewitt Employment Agreement are valid and enforceable contracts.

106.    Both Lucier and Hewitt voluntarily entered into their respective Employment Agreements in consideration for their employment with Plaintiffs and incident to that employment relationship.

107.    The restrictions set forth in the Lucier Employment Agreement and in the Hewitt Employment Agreement are reasonable and necessary to protect Plaintiffs' legitimate business interests and employment relationships.

108.    Lucier breached the Lucier Employment Agreement that he signed by, among other things:

(a)    Failing to devote his entire energy and full and undivided attention exclusively to the business of Plaintiffs;

(b)    Failing to maintain the confidentiality of Plaintiffs' confidential information and trade secrets, including specifically information about Plaintiffs' clients; and

(c)    Soliciting and/or accepting business from entities – including BMC and others– that is a prospective client of Plaintiffs with whom he had significant dealings with on behalf of Plaintiffs during his employment with Plaintiffs.

109.    Hewitt breached the Hewitt Employment Agreement by, potentially among other things, using Plaintiffs' confidential information relating to the BMC deal for her own benefit and for the benefit of Lucier and eTeam in manner that is detrimental to the Plaintiffs' business.

110.    By such actions, Lucier and Hewitt independently have caused and continue to cause Plaintiffs immediate and irreparable harm for which Plaintiffs have no adequate remedy at law.

111.    Lucier and Hewitt will continue such wrongful conduct unless enjoined.

112.     Lucier's and Hewitt's conduct has been willful, wanton and with the intent to damage the business of Plaintiffs.

## COUNT III – VIOLATION OF NEW JERSEY COMPUTER RELATED OFFENSES ACT
### (against Lucier)

113.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

114.     As set forth in detail above, Lucier intentionally and knowingly, without and/or in excess of his authorization, removed, via external storage devices and cloud storage technology, Plaintiffs' data that had been stored on Plaintiffs' laptop computer, in violation of the New Jersey Computer Related Offenses Act.

115.     As a direct and proximate result of Lucier's unauthorized removal of Plaintiffs' data that had been stored on its laptop, Plaintiffs have suffered irreparable harm and incurred losses including but not limited to damage caused by the loss of confidential and proprietary business information, plus additional time and expense associated with investigating Lucier's misconduct.

116.     Lucier engaged in the actions above willfully, intentionally, and maliciously and specifically to harm Plaintiffs.

## COUNT IV – MISAPPROPRIATION OF CONFIDENTIAL INFORMATION AND TRADE SECRETS
### (against all Defendants)

117.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

118.     The files, records, and documents of Plaintiffs including, but not limited to, those relating to Plaintiffs' short and long term business plans and strategies, business methods,

marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to Plaintiffs' by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual relationships with their suppliers, and the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff are highly confidential.

119.    Plaintiffs' confidential information and trade secrets referred to above derives independent economic value and provides an economic advantage to Plaintiffs over its competitors, and such information would be extremely valuable to a competitor of Plaintiffs, such as eTeam.

120.    Plaintiffs' have undertaken reasonable efforts to maintain the secrecy of their confidential information and to protect their customer relationships.

121.    Plaintiffs have expended significant time and resources developing its confidential  information.

122.    Plaintiffs' confidential information and trade secrets are unknown outside of its business and it is difficult for others to acquire or duplicate such information.

123.    Plaintiffs entrusted its confidential information and trade secrets to Lucier and Hewitt in confidence and had them execute Employment Agreements containing non-disclosure provisions regarding the same.

124.    Lucier has taken, disclosed, and used Plaintiffs' confidential information and trade secrets in breach of the confidence in which they had been entrusted to him.

125.    Hewitt has used Plaintiffs' confidential information and trade secrets in breach of the confidence in which they had been entrusted in her.

126.    Lucier, Hewitt and eTeam are using and intend to continue to use Plaintiffs' confidential information and trade secrets for their own benefit and to the detriment of Plaintiffs.

127.    Defendants' theft and unauthorized use of Plaintiffs' confidential information and trade secrets constitute misappropriation of confidential information and trade secrets.

128.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm and damages including but not limited to the loss of goodwill and business.

129.    Defendants engaged in the actions above willfully, intentionally, and maliciously and specifically to harm Plaintiffs.

130.    eTeam has accepted, acquired, and used Plaintiffs' trade secret information from Lucier and/or Hewitt either knowing that it was acquired in violation of their duties of confidentiality to Plaintiffs or eTeam knew based on Lucier's and Hewitt's former duties with Plaintiffs and their former relationship with BMC that they would necessarily be using Plaintiffs' trade secret information during the course of their duties for eTeam.

## COUNT V – CONVERSION
### (against Lucier and eTeam)

131.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

132.    At all relevant times, Plaintiffs were the owner of the confidential information and trade secrets described above and was entitled to the use and possession of the confidential information and trade secrets.

133.    Defendants took or aided in the taking of the confidential information and trade secrets, converted or assisted in the conversion of the confidential information and trade secrets to their own use, and exercised or assisted in the exercise of dominion and control over the confidential information and trade secrets in a manner that was inconsistent with Plaintiffs' right to the use, possession, and enjoyment of the confidential information and trade secrets, thereby depriving Plaintiffs of their property rights.

134.    Plaintiffs have suffered damages that are the reasonable and proximate result of Defendants' conversion.

135.    Plaintiffs have expended time and money in pursuit of retrieving the converted property.

136.    Defendants engaged in this wrongful conduct intentionally, willfully, maliciously, and with the intent to injury Plaintiffs.

### COUNT VI – VIOLATION OF NEW JERSEY TRADE SECRETS ACT
### (against all Defendants)

137.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

138.    The files, records, and documents of Plaintiffs including, but not limited to, those relating to Plaintiffs' short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to Plaintiffs' by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual

relationships with their suppliers, and the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff are highly confidential.

139.     Plaintiffs' confidential information and trade secrets referred to above derives independent economic value from not being generally known to, and not readily ascertainable by proper means by, other persons such as eTeam who can obtain economic value from its disclosure or use.

140.     Plaintiffs' have undertaken reasonable efforts to maintain the secrecy of their confidential information and to protect their customer relationships.

141.     By engaging in the conduct described above, including, but not limited to, by accessing and acquiring Plaintiffs' trade secrets while knowing or having reason to know he was doing so by improper means, Lucier has unlawfully misappropriated Plaintiffs' trades secrets and done so willfully and with malice.

142.     By engaging in the conduct described above, including, but not limited to, by disclosing Plaintiffs' trade secrets to eTeam and/or using them without express or implied consent of Plaintiffs and doing so by improper means including by stealing Plaintiffs' trade secrets via USB devices in breach of his confidentiality obligations to Plaintiffs, Lucier has unlawfully misappropriated Plaintiffs' trades secrets.

143.     By engaging in the conduct described above, including, but not limited to, by using Plaintiffs' trade secrets without express or implied consent of Plaintiffs and doing so by improper means, Hewitt has unlawfully misappropriate Plaintiffs' trade secrets.

144.     Lucier and Hewitt also knew or had reason to know that Plaintiffs' confidential information and trade secrets constituted trade secrets during their employment with Plaintiffs and up through the present time.

145.     Lucier also knew at the time of his access and acquisition of Plaintiffs' confidential information and trade secrets via external storage devices and his disclosure of the same that Plaintiffs' trade secret information was acquired through improper means.

146.     Lucier and Hewitt also have disclosed and/or used, and likely will continue to disclose and/or use, Plaintiffs' trade secrets based on the position they now hold with eTeam and the diversion of BMC's business.

147.     Defendants engaged in the actions above willfully, intentionally, and maliciously and specifically to harm Plaintiffs.

148.     Upon information and belief, and especially given the fact that eTeam has failed to satisfactorily respond to Plaintiffs' counsel regarding this matter, eTeam has accepted, acquired, and used Plaintiffs' trade secret information from Lucier and/or Hewitt either knowing that it was acquired by them in violation of their duties of confidentiality to Plaintiffs or eTeam knew based on Lucier's and Hewitt's former duties with Plaintiffs that they would necessarily be using Plaintiffs' trade secret information during the course of their duties for eTeam.

149.     Based on the above, Plaintiffs has suffered and will continue to suffer irreparable harm and damages.

### COUNT VII - MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT of 2016
### (against all Defendants)

150.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

151.    The confidential and proprietary information that Plaintiffs entrusted to Lucier, specifically the short and long term business plans and strategies, business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, financial information, computer software, and  information provided to Plaintiffs' by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual relationships with their suppliers, and the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff, constitute trade secrets because Plaintiffs derive independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy.

152.    Likewise, the confidential and proprietary information that Plaintiffs entrusted to Hewitt, specifically Plaintiffs' business methods, marketing schemes, pricing information, business proposals, sales information, bid specifications and details, prospective and current customer lists and information, computer software, and  information provided to Plaintiffs by current and prospective customers, including the specific nature of their needs and requirements, the types of talent that they need, the frequency of their needs, the locations at which their temporary staff members are assigned, the identities of their temporary staff suppliers, the terms of their contractual relationships with their suppliers, the expenses and costs associated with their temporary staffing programs including the rates at which they compensate their temporary staff,

and more., constitute trade secrets because Plaintiffs derive independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use; and they are subject of efforts that are reasonable under the circumstances to maintain their secrecy.

153.    The confidential trade secret information obtained by Lucier and Hewitt is related to Plaintiffs' services and products which are provided and used in interstate commerce.

154.    Under the Defend Trade Secrets Act of 2016 ("DTSA"), Lucier and Hewitt were prohibited from misappropriating Plaintiffs' trade secrets.

155.    As alleged above, Lucier and Hewitt violated these duties by disclosing Plaintiffs' trade secrets and confidential information to eTeam and/or using such information to solicit and convert Plaintiffs' business.

156.    Under the DTSA, eTeam was prohibited from misappropriating Plaintiffs' trade secrets when it knew or had reason to know that the trade secrets were acquired through improper means, i.e. disclosure by Lucier and/or Hewitt in violation of their contractual and common law duties.

157.    eTeam misappropriated Plaintiffs' trade secrets because it continues to use Plaintiffs' trade secrets and confidential information without express or implied consent of Plaintiffs when eTeam knew or had reason to know that their knowledge of the trade secrets was derived from a person(s) who owed a duty to the person seeking relief to maintain its secrecy or limit its use.

158.    Upon information and belief, Defendants' actual misappropriation of Plaintiffs' trade secrets has been willful and malicious.

159.     As a direct and proximate result of Defendants' actual misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered irreparable injury and sustained significant damage.  Moreover, Plaintiffs are threatened with additional and ongoing injuries, including losing prospective clients, unless Defendants are enjoined and restrained by an order of this Court.

160.     Pursuant to 18 U.S.C. § 1836(B), Plaintiffs are entitled to damages for actual loss and unjust enrichment caused by the misappropriation of its trade secrets.

161.     Pursuant to 18 U.S.C. § 1836(D), Plaintiffs are entitled to recovery of its attorney's fees.

## COUNT VIII - TORTIOUS INTERFERENCE WITH CONTRACT
### (against eTeam)

162.     Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

163.     Upon information and belief, at all times relevant to this action, eTeam was aware that Lucier was employed by Plaintiffs, was subject to an Employment Agreement that governed the terms of his employment with Plaintiffs, and was privy to Plaintiffs' confidential information and trade secrets.

164.     eTeam nevertheless recruited and hired Lucier, with the purpose and intention of competing with Plaintiffs and, in doing so, inducing or ratifying Lucier's breaches of the Employment Agreement.

165.     eTeam took these actions without justification or privilege and for the purpose of impairing Plaintiffs' ability to compete in the marketplace and in order to benefit eTeam and give itself an unfair competitive advantage.

166.     The conduct of eTeam constituted interference with the Employment Agreement.

167.    By such action, eTeam has caused and continues to cause Plaintiffs immediate and irreparable harm for which it has no adequate remedy at law and on account of which it has suffered actual damages.

## COUNT IX - TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (against all Defendants)

168.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

169.    Plaintiffs and eTeam are in direct competition in the business of providing temporary staffing management services.

170.    Plaintiffs had a reasonable expectation that it would establish a contractual relationship with BMC leading to Plaintiffs' economic advantage.

171.    Defendants were aware that Plaintiffs had negotiated a final form of agreement with BMC and/or that Plaintiffs had a reasonable expectation that a final form of agreement would soon be reached with BMC.

172.    Without justification, Defendants conspired to intentionally interfere with Plaintiffs' prospective economic advantage by diverting the BMC deal to eTeam and unlawfully using Plaintiffs' confidential information and trade secrets – including information derived from the assessment conducted by Plaintiffs for BMC and the work proposals, implementation plan, and contract documents presented to and negotiated between Plaintiffs and BMC – in order to do so.

173.    Were it not for Defendants' intentional interference in this regard, there was a high likelihood that Plaintiffs would have secured the BMC deal, and thus, Defendants' unlawful interference resulted in, and will continue to result in, damages to Plaintiffs in the form of, and at Plaintiffs' election, Plaintiffs' lost profits or disgorgement of Defendants' profits.

## COUNT X - UNFAIR COMPETITION
### (against eTeam)

174.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

175.    Plaintiffs and eTeam are in direct competition in the business of providing temporary staffing management services.

176.    Upon information and belief, eTeam designed and executed a scheme to solicit and hire Lucier and Hewitt with the purpose of obtaining an unfair competitive advantage and accessing Plaintiffs' confidential and proprietary information and protected client relationships. eTeam engaged in this conduct to convert Plaintiffs' business to eTeam.

177.    eTeam has acted for the purpose of injuring Plaintiffs and unfairly competing in the marketplace.

178.    eTeam's actions were and are intentional, willful and malicious.

## COUNT XI - CONSPIRACY
### (against all Defendants)

179.    Plaintiffs incorporate herein by reference the allegations of the preceding paragraphs.

180.    Defendants acted in concert to commit unlawful acts against Plaintiffs by converting, stealing, destroying and/or misappropriating Plaintiffs' confidential information and trade secrets.

181.    Defendants entered into an agreement to convert, steal, destroy and/or misappropriate Plaintiffs' confidential information and trade secrets and to unlawfully divert business and prospective business from Plaintiffs.

182.    Defendants committed overt acts in furtherance of the conspiracy by, in part, copying, modifying, removing, deleting, disclosing, and/or using Plaintiffs' confidential

information and trade secrets for the benefits of themselves and entities other than Plaintiffs, and by diverting business and prospective business from Plaintiffs.

183.     Defendants' conspiracy has directly and proximately caused damage to Plaintiffs.

184.     Defendants' conduct in this regard was intentional, willful, malicious and undertaken with the intent to injure Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants for relief as follows:

      a.     For a temporary restraining order, preliminary injunction, and permanent injunction which among other things:

      (i)     Enjoins Defendants from directly or indirectly, using or disclosing Plaintiffs' confidential, proprietary, or trade secret information for any purpose;

      (ii)     Requires Defendants to immediately return to Plaintiffs all of their confidential, proprietary, or trade secret information;

      (iii)     Enjoins Defendants from soliciting, or attempting to solicit or influence, or initiating any contact with, directly or indirectly, any of Plaintiffs' current or prospective customers with whom Lucier had contact or communications or acquired information about while employed by Plaintiffs; and

      (iv)     Requires Defendants to preserve the integrity and security of all Documents, and computer equipment, and any other material that may be discoverable, pursuant to the Federal Rules of Civil Procedure, in this action.

      b.     For costs of suit and attorneys' fees;

      c.     For damages;

      d.     For punitive damages;

      e.     Pre-judgment and post-judgment interest; and

      f.     For such other relief as the Court deems just and equitable.

Respectfully submitted:

ARCHER & GREINER, P.C.
Attorneys for Plaintiffs
USTECH and Workspend


BY:*/s/Patrick Papalia*
    Patrick Papalia, Esquire
    Robert T. Egan, Esquire
    Laura Link, Esquire

Dated: February 17, 2017


## LOCAL RULE 11.2 CERTIFICATION


Pursuant to Local Civil Rule 11.2, the undersigned counsel for Plaintiffs certifies that to the best of his knowledge, information, and belief, the matter in controversy is not the subject of any other action or proceeding.


           */s/Patrick Papalia*
           Patrick Papalia, Esquire

Dated: February 17, 2017

115694228v1